UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                    Civil No. 07-4744 (JRT/FLN)

        Plaintiff,

        v.                                   **REPORT AND
                                             RECOMMENDATION**

$90,000 in United States
Currency,

        Defendant,

Johnny Chan,

        Claimant.

_____

David W. Fuller, Assistant United States Attorney, for the Government.
Kevin M. Gregorious for Claimant Johnny Chan.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on May 28,

2009 on Claimant Johnny Chan's Motion to Suppress Physical Evidence [#53]. At the hearing, the

Court received testimony from Transportation Security Administration ("TSA") Officer Thomas

Cosgrove, TSA Officer Peter Finch, Airport Police Officer Todd Husby and Airport Police Officer

Mari Askerooth. The Government submitted seven exhibits during the course of the hearing.[1] The

matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636

and Local Rule 72.1. For the reasons which follow, this Court recommends Claimant Chan's

---

[1] Gov't Ex. 2 is a TSA Incident/Event Report.
Gov't Ex. 3 is the Declaration of Peter Finch
Gov't Ex. 4 is the Minneapolis/St. Paul Airport Police Department Incident Report.
Gov't Ex. 5 is the Minneapolis/St. Paul Airport Police Supplemental Report.
Gov't Ex. 6 is the CAD Operations Report.
Gov't Ex. 11 is the Screening Checkpoint Standard Operating Procedures.
Gov't Ex. 12 is the TSA Interoffice Memorandum.

Motion [#53] be **GRANTED**.

On July 10, 2007, the Airport Police at the Minneapolis/St. Paul Airport seized $90,000 from Claimant Johnny Chan. The seizure came at the end of an investigation process that began when Chan was selected by the airline on which he was traveling for heightened TSA screening. The issue before the Court is whether the money was lawfully seized.

The parties have stipulated that the motion does not challenge Chan's selection for heightened screening, does not challenge the constitutionality or validity of the TSA's nationwide Standard Operating Procedures, does not challenge the execution or results of the canine sniff that was performed on the currency, nor does it challenge the qualifications of the dog's handler. Instead, the focus of the motion is the interaction between the TSA, the Airport Police Department, and the Claimant, Johnny Chan.

For the reasons set forth below, the Court concludes that the money was not lawfully seized, and must be suppressed.

## I.  FINDINGS OF FACT

### A.  Testimony of Thomas Cosgrove.

Cosgrove testified that he has been a TSA screener at the Minneapolis/St. Paul International Airport since 2002. (Tr. 5.) Cosgrove currently works at Security Checkpoint 5 and was working at that same checkpoint on July 10, 2007, when Claimant Chan's money was seized. *Id.* To become a TSA screener, Cosgrove was trained to operate x-ray machines, conduct hand-wand screens of individuals, search bags and supervise individuals walking through metal detectors. (Tr. 6.) Cosgrove testified that in July 2007, the TSA screener uniform consisted of a white shirt with an embroidered badge. (Tr. 24.)

2

### 1.    Selectee Screening Process.

Cosgrove testified he was also trained in the standard operating procedures of the TSA, including those for conducting a "selectee screening," the type of screening the Claimant was subject to in this case. (Tr. 7.) Cosgrove testified that individuals are flagged for selectee screening by the airlines and their selection as such is marked on their boarding passes. (Tr. 8.) Passengers' boarding passes and identifications are initially reviewed by a security officer or other individual working for a private security company. *Id.* The initial reviewers sit in front of the checkpoint. *Id.* When that security officer comes across an individual who is designated for selectee screening, he or she notifies a TSA screener. *Id.* A TSA screener then comes over, takes the individual's boarding pass, and sees the individual through the security process. (Tr. 8.) To begin the screening process, a selectee must put their belongings through an x-ray machine just like those passengers who are not selectees. (Tr. 8-9.) Selectees are not allowed to touch their property once they put it though the x-ray machine to prevent them from taking out or putting something in their luggage that might be a prohibited item. (Tr. 31.) Next, the TSA screener and the selectee walk through the metal detector. (Tr. 9.) Then the TSA screener takes the selectee's belongings to a table behind the x-ray machines, searches the selectee's carry-on luggage, and performs a "bulk item pat-down" of the selectee's person. (Tr. 10.)

Mr. Cosgrove testified that under TSA policy, once a passenger has begun the screening process (either the selectee screening process or the regular screening process), he is not allowed to leave the screening area until the process is complete. *Id.* Cosgrove testified that if a passenger attempted to leave the checkpoint before the screening process was complete, a TSA screener would call a breach and the individual would eventually be apprehended by airport

3

police.  (Tr. 33-34.)

## 2. Cosgrove's Encounter with Chan.

Cosgrove testified that on July 10, 2007, he encountered Claimant Johnny Chan, a passenger who was designated for selectee screening on his boarding pass.  (Tr. 13-14.)  Upon notification from the person checking tickets in front of the security checkpoint that Mr. Chan was a selectee, Cosgrove came over to Mr. Chan, explained the selectee screening procedure, helped Mr. Chan place his belongings on the x-ray machine, and led Chan through the metal detector.  (Tr. 14.)  Cosgrove expressly asked Chan to "not touch the property until we cleared it and gave it back to him."  (Tr.15)

After Cosgrove and Chan passed through the metal detector, the x-ray operator told Cosgrove that there were three large opaque items in Mr. Chan's bag.  *Id.*  At that point, Cosgrove led Mr. Chan to a screening table where Cosgrove continued the screening.  (Tr. 15.)  Cosgrove frisked Mr.  Chan, conducting what the TSA calls a "bulk item pat-down".  Cosgrove then searched Mr. Chan's bag and discovered a black plastic garbage bag containing three bundles of cash.  (Tr. 16.)  Cosgrove described Chan's demeanor during this time as "fairly calm, maybe shifting one foot to the other as is - - you know, you're standing waiting for something to be done."  (Tr. 17.)  When Mr. Cosgrove asked Mr. Chan what the money was for, Mr. Chan said that he was going to Chicago to buy copy equipment.  (Tr. 18.)

Mr. Cosgrove testified that he called over his supervisor after he discovered the cash because he was required to notify his supervisor when he discovered anything out of the ordinary, including "significant sum[s] of cash under suspicious or unusual circumstances."  (Tr. 19, 32; Gov't Ex. 12 (Interoffice Memorandum Regarding Airport Police Notification of

Discovery of Suspect Currency, dated March 21, 2005).)  According to the TSA's Standard Operating Procedures ("SOPs"), "[i]t is not illegal for an individual to travel on commercial flights within the United States carrying large amounts of U.S. currency."  (Gov't Ex. 11.)  The SOPs do state, however, that amounts over $10,000 must be reported when taken from the United States to a "non-U.S. location."  *Id.*

Cosgrove testified that his supervisor, Peter Finch, came over to the screening table, observed the money, and asked Mr. Chan some questions.  (Tr. 20.)  Cosgrove's supervisor then left for about one minute to make a phone call and then returned to the screening table.  *Id.* While Cosgrove's supervisor was talking to Chan, Cosgrove was screening Chan's other piece of luggage.  *Id.*  Cosgrove testified that when he was almost finished searching the last bag, the TSA security manager and two airport police officers arrived.  *Id.*  Cosgrove testified that he did not contact the airport police and did not believe that his supervisor did either.  (Tr. 21.) Cosgrove testified that at the time the cash had been discovered and the supervisor and screening manager had been contacted, Mr. Chan's demeanor "appeared to be fine; maybe getting a little impatient at this point."  (Tr. 22.)  Cosgrove testified that compared to the demeanor of other selectees, Mr. Chan's demeanor was "rather mild."  (Tr. 23.)  Cosgrove testified that he had no difficulty communicating with Mr. Chan.  (Tr. 25.)

Mr. Cosgrove testified that his screening of Mr. Chan took roughly ten minutes.  (Tr. 26-27.)  Cosgrove testified that Mr. Chan did not appear intoxicated or incapacitated and that he never observed Mr. Finch make contact with Mr. Chan.  (Tr. 27.)

Mr. Cosgrove said that, before the Airport Police officers (APD) arrived, his supervisor dismissed him and he returned to his regular duties.  Before he left, however, Mr. Cosgrove

observed two plainclothes police officers arrive.  (Tr. 28.)  He did not hear the conversation between them and Mr. Chan.  (Tr. 28.)

### B.      Testimony of Peter Finch.

Peter Finch testified that he has been employed as a supervisor for the TSA since 2003.  (Tr. 41.)  He testified that he was the supervisor at Checkpoint 5 when Tom Cosgrove performed the selectee screening on Mr. Chan.  (Tr. 50.)

Finch testified that he observed Cosgrove bring Mr. Chan back to the screening table that was five feet away from Finch's supervisor desk.  (Tr. 51.)  Finch testified that Cosgrove called Finch over and told him to look inside the black plastic bag sitting on the table.  *Id.*  Finch observed a large amount of cash in the bag.  *Id.*  Finch asked Chan how much money was in the bag and Chan told him $90,000.  (Tr. 53.)  Finch then asked where Chan was flying and inspected Chan's boarding pass which indicated Chan was going to Chicago.  *Id.*  Finch testified he was told by Cosgrove that Chan was going to Chicago to buy copy machines for his brother's business.  *Id.*  Finch testified that, at this time, Chan was rifling through his wallet looking for a business card but was unable to find one.  (Tr. 53, 55.)

Finch testified that Chan presented a California driver's license along with his boarding pass.  (Tr. 54.)  When Finch asked Chan what he was doing in Minnesota, Chan said that he was looking at colleges with his daughter; however, Chan was unable to name a Minnesota college when asked which colleges they had visited.  *Id.*  During the conversation, contrary to Cosgrove's observation about Chan's demeanor, Finch claims that Chan appeared to be sweating and that his answers were short.  (Tr. 55.)  Finch stated that after he had the conversation with Chan about Minnesota colleges, he decided to notify his manager about what was happening.

(Tr. 55-56.)  Finch walked back to his desk to call Mike Kohanek, the TSA manager on duty. *Id.*

Without articulating any specific "suspicious or unusual circumstances" regarding the money,

Finch simply told Kohanek he had a passenger with $90,000 in cash and that, Finch "wasn't

really getting any answers on, on where he was going with it and whatnot." (Tr. 56.)  Kohanek

told Finch to finish the screening procedure and to let Chan leave.  (Tr. 57. )  Finch then returned

to the screening table to observe as Cosgrove finished the screening procedure.  (Tr. 56.) Finch

testified that he did not contact the APD, that Mr. Kohanek must have done so because Kohanek

arrived at the checkpoint with two airport  police officers before the screening process was over.

(Tr. 57.)

Upon returning to the screening table, Finch had a conversation with Chan about the

procedure for selectee screening.  (Tr. 56.)  Finch estimated that six or seven minutes elapsed

between the time Cosgrove initially called Finch over to the screening table until the airport

police arrived.  (Tr. 58.)

Mr. Chan was not free to leave the screening area until the screening process was

complete.  (Tr. 59, 81.)  Had Chan tried to leave prior to its completion, Finch would have been

required to call the police directly on the police phone line and would have had an available

screener follow Chan until the police caught up with him.  *Id.*  Before the TSA screening

procedure was complete, Airport Police arrived on the scene with Mr.  Kohanek, another TSA

supervisor.

Finch testified that when the police officers arrived, they inspected  Mr. Chan's boarding

pass and identification.  (Tr. 61.)  Finch testified that prior to the officers' inspection of them,

Chan's boarding pass and identification had been placed on the table next to Chan's luggage so

that he would not forget them. (Tr. 61.) When the airport police officers arrived, Chan's luggage was still sitting on the screening table. According to Finch, the screening process was soon over, but so far as the record shows, no one told Chan the process was over and that he was free to go. Indeed, the Court finds as a fact that a reasonable traveler in Chan's situation would have reasonably thought he was still not free to go, as he was now being escorted by two police officers into a TSA private screening room. (Tr. 60, 63.)

Finch testified that a few minutes after the airport police officers arrived, the two officers and Chan went into a TSA private screening room that was 15 or 20 feet away from the screening table. (Tr. 63, 64.) Finch testified that one officer led Chan into the room while the other officer followed and carried Chan's luggage. (Tr. 64.) He estimated there was about two or three feet between each person as they walked single file into the TSA's screening room. (Tr. 64.) Finch testified that the officers were in plain clothes. (Tr. 64.) Finch could not recall who was in possession of Chan's boarding pass and identification. (Tr. 65.) He testified that he believed the boarding pass was sitting next to Mr. Chan's luggage when the police arrived but he was not sure if he or Mr. Cosgrove placed the boarding pass and identification there. (Tr. 86.) Finch did not go into the private screening room with the officers and Chan. (Tr. 65.)

Finch testified that two APD officers initially showed up with TSA supervisor Kohanek and then other officers arrived later, but he was not sure how many. (Tr. 73.) Finch said that none of the officers had visible weapons. (Tr. 73.)

Shortly after his 1:05 p.m. encounter with Mr. Chan on July 10, 2007, Mr. Finch filled out an incident report regarding Mr. Chan's screening in which he wrote that his supervisor called Narcotics. "Narcotics then pulled the passenger into [the checkpoint's] private screening

room for questioning." (Gov't Ex. 2.) Nearly two years later, on March 19, 2009, Finch signed a declaration, under penalty of perjury, in which he swore that when he used the term "pulled" in his incident report, he did not mean that the officers physically pulled Mr. Chan into the room but rather "the officers showed Mr. Chan to the room near the checkpoint after he voluntarily agreed to go there to be interviewed." (Tr. 79- 77; Gov't Ex. 3 (Decl. of Peter Finch).)

The Court finds as a fact that the police did not physically "pull" Mr. Chan into the TSA screening room. However, the use of the word in Finch's contemporaneous report clearly connotes considerably less choice on Chan's part than the legally loaded and conclusory phrase "voluntarily agreed", used in Finch's later Declaration. (Govt. Ex. 3) While the Court credits Finch's explanation that the police did not physically pull Chan into the TSA private screening room, it rejects Finch's conclusory assertion that Chan "voluntarily agreed" to go there.[2] Indeed, in his testimony at the hearing, further explaining what he meant by the word "pulled," Finch testified that "pulled" was a terminology used at the check point to mean, "we had the passenger go into the private screening room with us." (Tr. 74-77)

The Court finds as a fact that Chan, as would any reasonable traveler under these circumstances, felt compelled to accompany the narcotics officers into the TSA's private screening room. Chan had been told not to touch his luggage until it was cleared and returned to him. To his knowledge the luggage had not been cleared, and certainly had not been returned to him. It was in the custody of the airport police officer who walked behind Chan, as the other

_____

[2]Moreover, Finch could not have had any personal knowledge regarding whether Chan "voluntarily agreed" to go with the police into the TSA's private screening room. He testified that after the police arrived and began to question Chan, "I didn't hear anything from that point." (Tr. 60)

officer lead him into the TSA private screening room; 15-20 feet away.

Mr. Finch testified that he was told in training that passengers are not required to answer questions asked by TSA screeners. However, Finch never told Mr. Chan that he did not have to answer questions posed by other TSA screeners. (Tr. 80-81.)

### C.     Testimony of Todd Husby.

Mr. Husby testified that he has been employed as a police officer with the APD for 14 years. (Tr. 95.) At the time of the incident involving Johnny Chan on July 10, 2007, Mr. Husby was working as the supervisor of the investigations division of the narcotics unit. *Id.* He is currently with the FBI's Joint Terrorism Task Force. *Id.*

Husby testified that he and Sergeant Bill Stevens responded to the call made to the APD about the discovery of money in Mr. Chan's carry-on bag. (Tr. 96.) Neither Husby nor Stevens were dressed in uniform or were displaying a gun or credentials but they were carrying concealed firearms. (Tr. 96,112-113.) Husby testified that when he arrived at Checkpoint 5, he asked to see Chan's boarding pass and driver's license. (Tr. 97.) He learned that Chan was traveling to Chicago, which in Husby's experience, was a source city for narcotics. (Tr. 97.)

Husby proceeded to ask Chan if they could talk for a few minutes. (Tr. 98.) He told Chan that Chan was not under arrest and was not in any trouble, but that Husby wanted to have a conversation with him. (Tr. 98.) Chan and Husby talked. *Id.* Husby did not, however, tell Chan that Chan was free to go at any time or that he was not required to talk to Husby. (Tr 115.) For the reasons more fully described below in Part I-D of this Report and Recommendation, the Court expressly disbelieves Husby's testimony that he gave "all his possessions" back to Mr. Chan. (Tr. 97-98).

Husby proposed to Chan they talk in the private screening room at the checkpoint because the checkpoint itself was busy and open. (Tr. 100.) Husby testified that the door to the screening room was closed but not locked when they were inside. (Tr. 114.) Chan told Husby that he had the cash because he bought and sold copy machines and sewing machines around the country to eventually ship from Los Angeles to other countries. (Tr. 101-102.) Husby said that Chan could not produce any documentation to corroborate his story. (Tr. 102.)

Husby testified that it was not illegal to travel domestically with $90,000 in cash. (Tr. 117.) Husby testified that he has come across large amounts of cash a couple hundred times in his time as an airport police officer. (Tr. 118.) He testified that in determining whether cash must be seized, he considers, among other things, where the individual is traveling from, and where he is going, and whether he has documentation for the money. (Tr. 118-119.)

Chan told Husby that he was in Minnesota to drop off his daughter at Concordia College Language Camp. (Tr. 102-103.) At some point during the conversation, a K9 officer and his dog arrived on the scene. At no time did anyone ask Chan for consent to subject his luggage to a dog sniff. (Tr. 103) Husby testified that it is just a routine thing they do when a large amount of currency is found. In response to a question about why he or Sgt. Stevens decided to contact a K9 officer, Husby testified, after repeating his hunch that the money was suspicious, ". . . And its kind of also routine that a narcotics K9 come to the scene if we're having - - or if we're having an encounter with somebody with currency. So we normally have a narcotics K9 come to the scene and conduct a currency sniff of the money." (Tr. 103)

After the canine sniff was performed and the dog alerted to the presence of a narcotic odor on the money, (Tr. 124.) the officers and Chan moved from the security checkpoint to the

police operations center. (Tr. 124.)  While at the police operations center, Chan stated he wanted to leave.  (Tr. 124.)  At that point, Chan was allowed to leave, but Husby testified he and the other officers told Chan that while he was free to go,  they were going to seize his money.  (Tr. 124.)  Husby testified that after the conversation with Chan was over and his money was seized, Chan had missed his flight to Chicago. Husby accompanied Chan to the ticket counter and arranged for Chan to be re-booked.  (Tr. 111.)

Husby testified that at some point after the dog sniff, he and the other officers knew that Chan had a criminal history and that there was a warrant out for his arrest.  (Tr. 126-127.)  The officers appear to have decided not to execute the arrest warrant.

### D. Chan's Boarding Pass, Identification and Luggage.

Husby and Finch both gave contradictory and evasive  testimony regarding what happened to Mr. Chan's boarding pass, identification and luggage between the time that Husby arrived at Checkpoint 5 and when Husby, Stevens and Chan went into the private screening room.  Husby initially testified that after he looked at Chan's boarding pass and identification, Husby asked the TSA screeners to return it to him, together with "all his possessions."  (Tr. 97.)  He next testified that he himself gave the boarding pass and identification back to Chan.  (Tr. 99.)  When asked about his prior testimony, Husby said that either he or the TSA gave Chan his papers back; that the incident had occurred a while ago and he was not sure.  (Tr. 113.)  When asked whether Chan was in possession of his boarding pass and identification when Chan entered the screening room, Husby testified, "I can't tell you with 100 – degree – 100 percent certainty whether he had them or whether he didn't at this time."  (Tr. 122.)

TSA screening supervisor Peter Finch testified that either he or Tom Cosgrove set the

boarding pass and identification down next to Chan's luggage on the screening table. Neither

TSA witness testified that they returned the boarding pass and identification to Mr. Chan, or that

either of them were requested to do so by Officer Husby. Moreover, when directly asked by the

Court whether Chan was given back his documents and told he was free to go, Finch testified

evasively, "That's our procedure". When asked by the Court whether Mr. Chan was told that,

the evasion continued,

> "I don't recall."
>
> "The Court: Did you tell him that?"
>
> "The Witness: I don't recall if I told him that or if Tom told him that".
>
> "The Court: Do you know if anyone told him that?"
>
> "The Witness: I'm not sure, no."
>
> (Tr. 62)

While both witnesses had difficulty recalling what they did with Chan's boarding pass

and identification, the testimony regarding Chan's luggage was more clear. Finch unequivocally

testified that the APD officers, "took his, his luggage and he followed them into our private

screening room, TSA's private screening room . . .. one officer took his luggage and followed

behind Mr. Chan while the other one was in front of him." (Tr. 63-64). Although Husby

initially testified that he had returned all of Chan's possessions to him (Tr. 97), he later testified

that he could not recall whether he or Sergeant Stevens took possession of Chan's luggage,

which would appear to corroborate TSA Supervisor Finch's testimony that the luggage was not

returned, but was taken by one of the two police officers into the TSA's private screening room.

(Tr. 98-99.)

Sorting through the inconsistent, contradictory, and evasive testimony of both Finch and Husby, the Court finds that the government has failed to establish that Chan's boarding pass and identification were returned to him before the police carried his luggage into the TSA's private screening room into which they also escorted Mr. Chan. The Court finds there is <u>no</u> credible evidence that anyone returned Mr. Chan's documents and told him he was free to go at what the government now claims is the conclusion of the TSA screening process. To the extent either witness attempted to testify that the boarding pass and identification was returned, this Court expressly disbelieves such testimony.[3]

At best, the record establishes that neither witness has an independent recollection of whether the boarding pass and identification were returned. (TR. 65; 121-122) The testimony is clear that Chan's luggage was not returned, but was carried by one of the two APD officers who escorted Chan into the TSA's private screening room. This Court finds that neither the luggage nor Chan's documents were returned to him before he was escorted into the TSA's private screening room.

**E.    Testimony of Mari Askerooth.**

Ms. Askerooth testified that she has been a police officer with the APD for seven and a half years. (Tr. 128.) For the last four and a half years, she has been a narcotics detective in the interdiction unit. *Id.* Her job involves intercepting large quantities of drugs and cash coming through the airport. *Id.*

---

[3]For the same reasons set forth in the text, the Court also rejects the self serving statement in Sgt. Steven's report (Govt. Ex. 5) dated nearly two years after the event, that "Sgt. Husby requested Chan's documents and all his belongings be returned to Chan. With the screening process completed, the TSA complied by returning his documents and belongings to him." The testimony of the witnesses at the hearing is inconsistent with this statement.

Askerooth testified that she arrived at Checkpoint 5 after Husby was on the scene. (Tr. 129.) She testified it was early afternoon. (Tr. 129.)

Askerooth testified she believed that someone from the airport police dispatching office conducted a "wants and warrants" information request on Chan at 1:13 p.m. (Tr. 132-33.; Gov't Ex. 6.) The search revealed that Chan had an outstanding felony arrest warrant for financial fraud that had been issued on May 24, 2001. (Tr. 132-33.) She testified she did not recall whether any of the officers at or near Checkpoint 5 during the time that Chan was being questioned knew about the warrant. (Tr. 133.) She testified it was "likely" and "possible" that she and the other officers would have known at that time there was a warrant out for Chan's arrest. (Tr. 134.)

Askerooth testified that she does not recall telling Mr. Chan at any point during the questioning that he was free to leave. (Tr. 148.) She testified she knew that he did not ask to leave because he would have been allowed to leave had he requested to do so.

## II.  CONCLUSIONS OF LAW

The $90,000 seized from Mr. Chan was the fruit of an unlawful seizure of his luggage as well as the unlawful detention of Mr. Chan. The money must be suppressed.

### A.    Fourth Amendment

The Fourth Amendment to the United States Constitution protects in part the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Items seized in violation of the Fourth Amendment may generally not be used as evidence at trial. *Mapp v. Ohio*, 367 U.S. 643 (1961) (barring use in federal courts of evidence seized by state officers in violation of the Fourth Amendment). The exclusionary rule applies to

forfeiture proceedings. *One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania*, 380 U.S. 693, 696 (1965).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 129 S.Ct. 1710, 1716 (2009) (citing *Katz v. U.S.*, 389 U.S. 347, 357 (1967)).

The Government does not dispute that the Claimant's money was subjected to a seizure and a search during the TSA checkpoint screening. Nor does the government contend that Chan was not detained during his screening by the TSA. (Gov't Post-Hrg. Memo at 10, 26.) The Claimant does not challenge the constitutionality of the TSA screening process that led to the discovery of Claimant's currency here, so this Court will simply assume without deciding that the TSA's screening process at the Minneapolis/St. Paul Airport does not violate the Fourth Amendment.[4] The government contends, however, that the seizure of the Claimant's luggage and the detention of the Claimant ended at some point before the luggage was subjected to a dog sniff, and that the Claimant thereafter voluntarily consented to the continued investigation into the facts surrounding his money. For the reasons set forth below, the Court rejects the government's contentions and concludes that any reasonable traveler in Mr. Chan's circumstances would have perceived that he was not free to leave from the moment he and his

---

[4] Notwithstanding the dicta in *Florida v. JL*, 529 U.S. 266 (2000), quoted by the government at p.12 of its Post Hearing Memorandum, the Supreme Court has never directly held that suspicionless general searches routinely conducted by the TSA of all airline passengers at the nation's airports, including the Minneapolis/St. Paul Airport comport with the Fourth Amendment. As Claimant does not challenge the constitutionality of the TSA procedures, the Court will simply assume, without deciding, that the TSA's extraordinary contentions regarding its authority are not inconsistent with the Fourth Amendment.

luggage were seized by TSA Officer Cosgrove, until he was released after the APD refused to return his money to him after the dog sniff.

   B.   **Claimant's Luggage Was Seized Without Probable Cause and Without a Reasonable Suspicion That It contained Contraband or Evidence of a Crime.**

The Court concludes that Chan's luggage was unlawfully seized[5] when the APD officer took possession of it and carried it into the TSA's private screening room. At that moment the APD had neither probable cause nor even a reasonable articulable suspicion that the luggage contained contraband or evidence of a crime. Nor did Chan voluntarily consent to the seizure.

A seizure occurs when "there is some meaningful interference with an individual's possessory interest in that property." *U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). When the Airport Police took possession of Chan's luggage by carrying it into the private screening room, they seized it within the meaning of the Fourth Amendment. The government does not contend that it had probable cause for the seizure, but argues that the Airport Police had a reasonable articulable suspicion. The Court disagrees.

At best the Airport Police had a hunch that the money might be suspicious. The evidence simply does not establish any articulable suspicion that would justify a seizure of the luggage or its contents. At the moment of seizure, the police knew only that Mr. Chan had $90,000 in U.S. Currency, that he made no effort to conceal, and that he was transporting to Chicago. Mr. Chan knew the amount of money and answered the officer's questions about what he intended to do with it. Until the dog alerted to the money, the police had found no drug related evidence on

_____

[5]Although the government concedes that the luggage was "seized" at the moment the TSA took possession of it, Chan does not challenge that seizure as being unlawful. So the question before the Court is when, if at all, did the government's detention of the luggage become unlawful.

Chan's person, or in his luggage.  While the police later learned that Mr.  Chan had a criminal history, they did not know that until after the dog sniff.  (Tr.  126-127) Neither the TSA, nor the police officers were able to articulate a basis for believing the money carried by Mr.  Chan was drug related.  Their respective descriptions of why they continued to investigate the money rise no higher than the level of a "hunch", which is insufficient to warrant an investigatory seizure of Mr.  Chan's luggage.  See Terry v.  Ohio, 392 U.S.1 (1968); United States v.  Place, 462 U.S. 696 (1983).

TSA Supervisor Finch testified that when he called his supervisor, he reported that, "I had a passenger here with $90,000.  Just through conversation I wasn't really getting any answers on, on where he was going with it and what not."  (Tr.  56).  This is untrue.  Both TSA Officer Cosgrove and TSA Supervisor Finch had established, by looking at Chan's boarding pass, that he was going to Chicago with the money.  They also knew that there was nothing in and of itself unlawful about carrying this amount of money to Chicago.  When Finch's suggestion that he wasn't getting any answers on "where he was going" with the money is removed, all that remains is "what not".  This is at best a hunch and in any event does not rise to the level of an articulable reasonable suspicion.

Finch also testified that Chan told him he was in Minnesota to take his daughter to look at colleges but couldn't name one.  Mr.  Chan consistently told others he had brought his daughter to Concordia College to attend a summer language camp.  (Tr.  102-03, see also Govt. Ex.  4).  Finch also said that Chan was unable to produce a business card or other documentation to corroborate his statements about what he intended to do with the money.  While Finch and Husby both thought Chan's description of the business he was in sounded suspicious, Chan

appears to have given the same explanation, with various degree of specificity to everyone who asked. (Tr. 101-02; Govt Ex. 4) That the explanation sounded suspicious to the TSA police officers does not constitute the reasonable articulable suspicion required for an investigative seizure.

The Court further concludes that at no time did Mr. Chan ever consent to the seizure of his luggage. While Officer Husby testified that Mr. Chan agreed to talk with him, the Court expressly disbelieves any testimony or declaration that Mr. Chan's luggage was ever returned to him. There is no evidence that any law enforcer asked Mr. Chan for permission to take custody of his luggage or ever asked his consent to the dog sniff. Indeed, Husby testified that it is, "routine that a narcotics K9 come to the scene if we're having . . . or if we're having an encounter with somebody with currency." (Tr. 103)

As the Airport Police had no more than a hunch that the $90,000 was drug related, and as Mr. Chan never consented to the seizure of his luggage, the APD's seizure of Mr. Chan's luggage, to subject it to a dog sniff, when they arrived just prior to the conclusion of the TSA screening was unlawful and the money must be suppressed.

There is nothing in the Eighth Circuit's en banc holding in *United States v. Va Lerie*, 424 F.3d 694 (8th Cir. 2005) that is inconsistent with the foregoing seizure analysis. The en banc Eighth Circuit expressly recognized that its analysis of the seizure issue in that case was limited to claims regarding checked luggage (over which the owner has already relinquished their possessory interest to the common carrier). Said the Court, at footnote 4,

> "We also underscore this is not a seizure case involving luggage physically possessed by a commercial bus passenger. See, United States v. Place, 462 U.S. 696 ... (1983) (recognizing detention of luggage within passenger's immediate possession

19

intrudes on passenger's freedom of movement, such that the passenger's travel plans may be disrupted); cf Hale v. Henkel, 201 U.S. 43 . . . (1906) (noting "A seizure contemplates a forcible dispossession of the owner"). Instead, Va Lerie's seizure case involves checked luggage not in the passenger's immediate possession."

424 at 702 n.4.

The luggage at issue here, unlike the checked luggage at issue in *Va Lerie*, was Chan's carry on luggage. It was taken by the Airport Police directly from the TSA, who had taken it directly from Mr. Chan. While the Claimant does not challenge the seizure by the TSA for screening purposes, when the APD seized the luggage from the TSA, it did so without probable cause, without reasonable suspicion, and without Chan's consent. The money, that was the fruit of this seizure, must be suppressed.

### C.    Claimant Was Detained Without Probable Cause and Without a Reasonable Suspicion That He Was Engaged In Criminal Activity.

The government concedes that Claimant was not free to leave during his entire encounter with TSA. It contends, however, that his subsequent encounter with the APD was consensual, and that Claimant was not detained by APD. The Court concludes otherwise. The government bears the burden of proving that the Claimant's consent to the encounter was voluntary. *U.S. v. $91,960.00*, 897 F.2d 1457, 1460 (8th Cir. 1990) (citing *United States v. Mendenhall*, 446 U.S. 544, 547 (1980)). "This issue of voluntary consent is determined in light of the totality of all the circumstances." *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Mendenhall*, 446 U.S. at 554.

The Court expressly rejects the Government's contention that while Claimant was not free to leave the checkpoint, he was free not to answer the TSA's questions, and free to terminate the police encounter. The government offers no explanation of how a traveler, such as Claimant, would know that, as the government concedes, they were not free to leave the area without being arrested by Airport Police, but were free to decline to answer questions posed by the TSA, and free to walk away from the airport police who the TSA had summoned. The Court expressly concludes that a reasonable person in Claimant's position would not feel they were free to leave.

No reasonable person in Claimant's position would have felt free to terminate the encounter with the APD officers. The government seeks to treat the Claimant's encounter with TSA and his encounter with APD as two separate and independent events. A reasonable person in Claimant's position would not perceive them as such. Chan was seamlessly ushered from screener Cosgrove, to Cosgrove's supervisor Finch, to Airport Police Officer Husby. One police officer then carried Chan's luggage into the TSA's private screening room while another escorted Chan himself. Chan had previously been told by TSA Officer Cosgrove not to touch his luggage until "we cleared it and gave it back to him" (Tr. 15) As the APD officer carried his luggage into the TSA private screening room, Mr. Chan reasonably believed it had not been cleared and returned to him.[6]

Although the government argues that the TSA screening was complete and a whole new

---

[6]Although a report dated a year and eight months after the event suggests that Chan's luggage was returned to him between the time the Airport Police arrived and the time it was carried by the Airport Police into the TSA's private screening room, the Court expressly rejected the credibility of the report. The report together with Officer Husby's initial testimony on this point is inconsistent with the testimony of TSA Supervisor Finch, as well as Husby's own later inconsistent testimony.

APD consensual encounter had begun, the evidence paints a very different picture. No witness was able to testify that Chan's luggage, boarding pass and identification was ever returned to him. The government's witnesses on this issue, Finch and Husby, gave conflicting and evasive testimony. The Court finds, based upon the testimony that Chan was led into the private screening room by one APD officer and followed by another who carried his luggage, that Chan reasonably believed he was not free to leave, but was being detained by the APD.

The conduct of the APD officers and the TSA screeners did nothing to alert Claimant that he was (as they now contend) free to go, and instead their conduct only reinforced his reasonable perception that he was not free to go, just as he was in fact not free to go during the TSA screening process. Husby testified he never told Chan he was free to go or was free not to talk. Further, Husby testified that whenever they encountered large sums of money, it was their routine procedure to subject the money to a dog sniff. (Tr. 102-03.) Under the totality of the circumstances, the Court concludes Claimant's encounter with the APD was not based upon his voluntary consent. At best, Claimant acquiesced to a claim of authority. *See Bumper v. North Carolina*, 391 U.S. 543 (1968) (holding that prosecution's burden to show consent to search not met by "showing no more than acquiescence to a claim of lawful authority").

The Government makes much of the fact that Husby initially told Chan that he was not under arrest and was not in any trouble and that Chan agreed to speak with Husby. However Chan's freedom of movement was already restricted because he was at a security checkpoint where the government concedes he was not free to leave during the screening process and it was not entirely clear the screening process was over at the time Husby approached Chan because Chan's luggage was still sitting on the screening table. Furthermore, given the smooth process

in which Chan was ushered from Cosgrove to Finch to Husby, Chan's oral agreement to speak to Officer Husby did not convert what the government concedes was a TSA detention into a voluntary police encounter.

The Government's reliance on *Florida v. Bostick*, 501 U.S. 429 (1999); *United States v. Mendenhall*, 446 U.S. 544 (1980); and *United States v. Va Lerie*, 424 F.3d 694 (8th Cir. 2005), is misplaced. The government contends that like the passengers in each of those cases, the Claimant here was simply involved in a voluntary encounter with the police that did not rise to the level of an involuntary detention. In each of those cases a passenger was approached by a law enforcement officer who engaged them each in conversation. In each case the reviewing court held that there had been no Fourth Amendment detention of the passenger.

What distinguishes this case from those is that Chan's encounter with the Airport Police began while he was still detained by the TSA. In *Bostick*, *Mendenhall* and *Va Lerie*, immediately before the passengers' respective encounters with law enforcement, each of them were free to go about their business. In each case, therefore, the question before the reviewing court was whether there was anything about the encounter that changed the passenger's reasonable perception about their freedom to terminate the encounter. Here, by contrast, the government concedes that during his entire encounter with the TSA, Chan <u>was</u> detained and was not free to terminate the encounter. The question here, therefore, is whether there was anything about the encounter with the Airport Police that changed Chan's reasonable and accurate perception that he was not free to terminate the encounter with government authority.

At the time the Airport Police arrived, the TSA was just finishing its screening, a process during which the government concedes Claimant was not free to go. No one told Chan he was

free to go, and everything that happened next only reinforced Chan's reasonable impression that he was not free to leave. As he had been seamlessly handed off from Cosgrove to Finch, he was now being handed over to another level of authority. While Husby might have told Chan he was not under arrest or in any trouble, no one told Chan he was free to go, and his luggage (which he had expressly been told not to touch until it was returned to him) (Tr. 15) was being carried by a police officer into a TSA private screening room into which Chan was also being escorted by the police officer's partner.

In short, the Court concludes that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. 544, 554 (1980). Chan had been seized without probable cause, and without reasonable suspicion. The money that was thereafter taken from him was the fruit of this unlawful detention and must be suppressed.

>    **D.    Assuming Without Deciding the APD Had a Reasonable Suspicion to Detain Claimant for a *Terry* Type Pat-Down and Dog Sniff, the Removal of the Claimant and His Luggage to the TSA's Private Screening Room Exceeded the Bounds of a Permissible *Terry* Stop.**

As described above in Part II-B of this Report and Recommendation, the Court concludes that the government agents lacked a reasonable suspicion and had nothing more than a "hunch" that Chan's money might be drug related. However, even assuming they had a reasonable suspicion, the government's agents exceeded the scope of a reasonable *Terry* stop. See also *United States v. Dixon*, 51 F.3d 1376, 1380 (8th Cir.1995) ("An investigative stop must be temporary and must last no longer than is necessary to effectuate the purpose of the stop and [t]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.") The facts here are in some

material ways very similar to the facts in *Florida v. Royer*, 460 U.S. 491, 500 (1983).

In *Royer*, an airline passenger was stopped by two plain-clothes detectives on one of the airport concourses at the Miami International Airport because he fit what the government called "the drug courier profile." *Id.* at 493. The detectives approached Royer and asked him if he had a moment to speak with them. Royer said yes. The detectives asked to see Royer's ticket and driver's license, which Royer produced. While in possession of Royer's ticket and driver's license, the detectives led Royer to an investigation room adjacent to the concourse several feet away from where they were standing. Without Royer's consent or agreement, one of the detectives retrieved Royer's checked luggage using his baggage claim stubs. Royer was then asked if he would consent to the search of his suitcases. Without orally consenting, Royer took out a luggage key and opened one of the suitcases. Drugs were eventually found in both suitcases. Royer was then arrested. The entire encounter lasted approximately fifteen minutes. *Id.* at 493-95.

The *Royer* Court concluded that the law enforcement officers exceeded the scope of a *Terry* stop. After reciting several black letter principles of Fourth Amendment law, Justice White, writing for a plurality of the Court,[7] rejected the government's contention that the entire encounter was consensual, and concluded that:

> "Asking for and examining Royer's ticket and his driver's license
> were no doubt permissible in themselves, but when the officers

---

[7]"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Gregg v. GA*, 428 U.S. 153, 169 n.15 (1976), <u>quoting</u>, *Marks v. U.S.*, 430 U.S. 188, 193 (1968). With respect to whether the officers violated Royer's Fourth Amendment rights, White's plurality opinion interprets the amendment more narrowly than does Brennan's concurring opinion.

> identified themselves as narcotics agents, told Royer that he
> was suspected of transporting narcotics, and asked him to
> accompany them to the police room, while retaining his ticket
> and driver's license and without indicating in any way that he
> was free to depart, Royer was effectively seized for the purposes
> of the Fourth Amendment. These circumstances surely amount
> to a show of official authority such that "a reasonable person
> would have believed he was not free to leave." *Royer*, 460
> U.S. at 501-02 (quoting *U.S. v. Mendenhall*, 446 U.S. 544,
> 554 (1980).

While conceding that the officers had a reasonable suspicion that would have justified a *Terry* stop, the Court concluded the stop was "more intrusive than necessary," and that the officers could have obviated any claim the encounter was not consensual by returning Royer's ticket and license and by informing Royer he was free to go if he so desired. *Id.* at 504.

The Court concluded that the stop exceeded the bounds of *Terry* stop, in part, because the officers moved Royer to an interrogation room adjacent to the concourse, several feet away. The Court noted that law enforcement officers might move an individual whom they have stopped for safety and security reasons. However, there was no indication the officers brought Royer to the room for those reasons; the Court concluded the officers brought Royer into the room only to search his luggage. *Id.* at 505.

In explaining their conclusion that Royer's detention exceeded the bounds of a lawful *Terry* stop, the *Royer* plurality helpfully compared the facts there to the facts in *United States v. Mendenhall*, *supra*:

> "Here Royer's ticket and identification remained in the possession
> of the officers throughout the encounter; the officers also seized
> and had possession of his luggage. As a practical matter, Royer
> could not leave the airport without them. In *Mendenhall*, no
> luggage was involved, the ticket and identification were
> immediately returned, and the officers were careful to advise
> that the suspect could decline to be searched. Here the officers

had seized Royer's luggage and made no effort to advise him
that he need not consent to the search." *Royer*, 460 U.S. at
503 n.9.

Assuming then that the APD's suspicion regarding Claimant's cash would permit a brief

detention to ascertain the legality of carrying the money, this Court concludes that the stop

exceeded the bounds of a permissible *Terry* stop. The facts here are much closer to the facts in

*Royer* than they are to the facts in *Mendenhall.*

Here, as in *Royer*, the APD took Claimant and his luggage to the TSA private screening

room, which was adjacent to the screening check point, but several feet away.[8] Here, as in

*Royer*, and unlike in *Mendenhall*, Chan's identification and boarding pass were not immediately

returned. While the testimony on this point was far from clear, for the reasons set forth above at

Part I;D of this Report and Recommendation, the Court concludes that the government has failed

to establish that those documents were returned before the removal to the TSA's private

screening room.

Here also, as in *Royer*, and unlike in *Mendenhall,* Chan was not notified that he was free

to leave if he so chose. The government correctly observes that the Supreme Court has never

held that police are required to tell a suspect he is free to go, or that he has the right to refuse

consent to search. *Royer* and *Mendenhall*, however, make clear that whether such advice was

given is clearly a factor the Court should consider in making a decision about whether a

reasonable person would believe they were free to leave, and whether a given stop exceeded the

bounds of a reasonable *Terry* stop. The failure to communicate that Chan was free to leave is

---

[8]The Court concludes as a matter of law that the difference between the 40 feet away in
*Royer* and the 15-20 feet away here is immaterial for the purpose of this *Terry* stop analysis.

even more significant in this case than in *Royer*. Unlike Royer, who before his police encounter had been freely going about his business, when Chan encountered the APD he was being detained during the TSA screening where the government concedes he was *not* free to leave.

Even if the Airport Police's hunch about the legality of Chan's money, amounted to a reasonable, articulable suspicion, because the facts here are more like the facts in *Royer*, and less like the facts in *Mendenhall*, the stop of Claimant Chan exceeded the bounds of a permissible *Terry* stop, and the fruit of that unlawful detention, Mr. Chan's $90,000, must be suppressed.

### E. The Outstanding Warrant for Chan's Arrest.

The outstanding arrest warrant for Claimant might have provided a lawful basis to seize the money (incident to arrest) if the APD had executed the warrant. *Knowles v. Iowa*, 525 U.S. 113 (1998) (search incident to arrest only lawful if an actual arrest occurs); *Arizona v. Gant*, 129 S. Ct. 1710 (2009) (search incident to arrest must be related to the rationale for the exception; destroy evidence or get weapon). Here, however, the arrest warrant was not executed and the warrant cannot be relied upon to seize the cash.

The Government's reliance on *United States v. Johnigan,* 90 F.3d 1332, 1335-36 (8th Cir. 1996), is misplaced. In *Johnigan*, the Court held only that knowledge of an outstanding arrest warrant for someone named Johnigan, the name used by the suspect to register at a nearby hotel, constituted a reasonable suspicion to detain Johnigan long enough to ascertain if he was the same man for whom an arrest warrant was outstanding. Here there is no evidence that Chan was detained to ascertain whether he was the same man for whom the arrest warrant was outstanding. Moreover, the *Johnigan* Court held that the scope of the detention was reasonable because the police used the least intrusive means reasonably available to ascertain Johnigan's

identity.  Here, the Court has concluded that, as in *Royer*, the police did not use the least

intrusive means to confirm or dispel their suspicions, but exceeded the scope of a reasonable

*Terry* stop when they removed Chan and his luggage to the TSA's private screening room to

conduct a dog sniff.

Finally, in *Johnigan*, unlike here, the money at issue was seized incident to a lawful

arrest when the outstanding arrest warrant was immediately executed, once the police

determined Johnigan was the same man for whom the arrest warrant was outstanding.  Here, it

appears, for whatever reason, the police,  if they even knew about the arrest warrant,  decided not

to execute it.  As the arrest warrant was not executed, its existence cannot be relied upon by the

government to support the seizure of Mr. Chan's money.[9]

### III.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that Claimant Johnny Chan's Motion to Suppress Physical Evidence [#53]

be **GRANTED**.


DATED: September 22, 2009                    *s/ Franklin L.  Noel*
                                             FRANKLIN L. NOEL
                                             United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with

---

[9]  The government's reliance on *United States v. Sturgis*, 238 F.3d 956 (8th Cir. 2001) is
likewise misplaced.  In *Sturgis*, the defendant challenged his two-hour detention while police
officers waited for a drug dog to perform a dog sniff.  *Id.* at 959.  The court held that because law
enforcement officers had probable cause to arrest Sturgis before they called for the dog, it was
immaterial whether the actual arrest occurred before or after the two hour wait.  Here, the
government lacked probable cause before the dog sniff, but seeks to rely on an outstanding but
unexecuted arrest warrant, a fact not present in *Sturgis*.

the Clerk of Court and serving on all parties, on or before **October 6, 2009**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **October 6, 2009,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.