## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

$90,000 IN U.S. CURRENCY,

Defendant,

JOHNNY CHAN,

Claimant.

Civil No. 07-4744 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

---

David W. Fuller and James S. Alexander, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Steven J. Meshbesher, **MESHBESHER & ASSOCIATES, P.A.**, 10 South Fifth Street, Suite 225, Minneapolis, MN 55402, for defendant.

Steven J. Meshbesher and Kevin M. Gregorious, **MESHBESHER & ASSOCIATES, P.A.**, 10 South Fifth Street, Suite 225, Minneapolis, MN 55402, for claimant.

This civil forfeiture case is before the Court on claimant Johnny Chan's motion to suppress $90,000 in United States currency seized by Minneapolis/St. Paul Airport police on July 10, 2007. On September 22, 2009, United States Magistrate Judge Franklin L. Noel filed a Report and Recommendation recommending that the Court grant Chan's motion to suppress. The United States timely filed objections, and the Court reviews

*de novo* those portions of the Report and Recommendation to which the United States objects. *See* 28 U.S.C. § 636(b)(1)(C); D. Minn. LR 72.2(b). For the reasons set forth below, the Court overrules the objections, adopts the Report and Recommendation, and grants Chan's motion.

## BACKGROUND

On July 10, 2007, Minneapolis/St. Paul Airport Police Department ("APD") officers seized $90,000 from Johnny Chan after Chan was selected for heightened screening under Transportation Security Administration ("TSA") procedures. Chan moved to exclude the physical evidence, arguing that the money was seized pursuant to an unlawful search and seizure. Prior to filing a Report and Recommendation, the Magistrate Judge held a hearing at which TSA Officer Thomas Cosgrove, TSA Officer Peter Finch, APD Officer Todd Husby, and APD Detective Mari Askerooth testified.

The parties agree that the question presented in the motion to suppress is whether the $90,000 was lawfully seized, and the motion briefs focus on "the interaction between the TSA, the Airport Police Department and the Claimant, Johnny Chan." (Report and Recommendation at 2, Docket No. 74; Stipulation, Docket No. 60.) The parties stipulate "that the motion does not challenge Chan's selection for heightened screening, does not challenge the constitutionality or validity of the TSA's nationwide Standard Operating Procedures, [and] does not challenge the execution or results of the canine sniff that was performed on the currency[.]" (Report and Recommendation at 2, Docket No. 74; Stipulation, Docket No. 60.)

# I.    CHAN'S SELECTION FOR HEIGHTENED SCREENING

Thomas Cosgrove is a TSA screener at the Minneapolis/St. Paul Airport and was working at Security Checkpoint 5 on July 10, 2007, when Chan entered that checkpoint. (Hr'g Tr. at 5-6, Docket No. 64.)   Chan's boarding pass flagged Chan for "selectee screening." (*Id.* at 13-14.)

Airlines flag certain passengers for heightened screening under the selectee screening process. (*Id.* at 8.)   When initial reviewers at TSA checkpoints determine that a party has been selected for heightened screening, the reviewers notify a TSA screener who approaches the individual, takes the individual's boarding pass, and escorts the passenger through the TSA security process. (*Id.* at 8-9.)   Once a selectee has placed items in the x-ray machine, the TSA screener does not allow the selectee to touch their property again until security clears it. (*Id.* at 31.)   Further, once a selectee has begun the heightened screening process, the selectee may not leave the screening area until the TSA screeners have completed the security process. (*Id.* at 10.)   According to Cosgrove, if a selectee attempts to leave the checkpoint before the screening is complete, the TSA screener calls a security breach and airport police apprehend the selectee. (*Id.* at 33-34.)

After the initial reviewer notified Cosgrove that Chan was flagged for selectee screening, Cosgrove approached Chan, took his ticket, explained the selectee screening procedure, helped Chan place his bags in the x-ray machine, and led Chan through the metal detector. (*Id.* at 14.)   Cosgrove directed Chan not to touch his property until it cleared the machine and until TSA screeners gave it back to him. (*Id.* at 15.)   After

Cosgrove escorted Chan through the metal detector, the x-ray operator informed Cosgrove that there were three large, opaque items in one of Chan's bags. (*Id.* at 14.) Cosgrove led Chan to a screening table, where he frisked Chan. (*Id.* at 15.) Cosgrove proceeded to search Chan's bag, where he discovered a black plastic garbage bag with three bundles of U.S. currency. (*Id.* at 16.) Cosgrove testified that during this time, Chan was "fairly calm, maybe shifting one foot to the other as is—you know, you're standing waiting for something to be done. I don't know if—I don't know if you would consider it impatient or not." (*Id.* at 17.) Cosgrove asked Chan what the money was for and Chan responded that he was going to Chicago to buy copy equipment. (*Id.* at 18.)

After Cosgrove discovered the U.S. currency in Chan's bag, he contacted his supervisor, TSA Officer Peter Finch. (*Id.* at 18-19.) Cosgrove testified that he did so pursuant to TSA's standard operating procedures, which direct screeners to contact their supervisors if they discover something out of the ordinary, including significant sums of cash in unusual circumstances. (*Id.* at 19, 32.) TSA's Standard Operating Procedures state, however, that "[i]t is not illegal for an individual to travel on commercial flights within the United States carrying large amounts of U.S. currency." (Gov't Ex. 11.)

When Finch arrived at the screening area, Finch examined the money and asked Chan some questions.[1] (Hr'g Tr. at 20, 51, Docket No. 64.) Finch asked Chan how

---

[1] Finch testified that Chan was not free to leave the screening area until the TSA officers had completed the screening process. (Hr'g Tr. at 59, 81, Docket No. 64.) Like Cosgrove, Finch testified that if Chan had attempted to leave prior to the completion of the screening process, Finch would have been required to contact the APD, which would have detained Chan. (*Id.* 59-60.)

much money was in the bag, and Chan responded that the bag contained $90,000. (*Id.* at 53.) Finch also observed that Chan was traveling to Chicago, and Cosgrove informed Finch that Chan was going to Chicago to buy copy machines for his brother's business. (*Id.*) Finch noted that Chan looked in his wallet for a business card, but could not produce one. (*Id.* at 53, 55.)

Finch testified that Chan's boarding pass and identification remained with TSA officers until the officers had completed the screening process. (*Id.* at 54.) Finch testified that Chan had a California driver's license, and that Finch asked Chan what he was doing in Minnesota. (*Id.*) Finch testified that Chan responded that he was looking at colleges with his daughter, but, according to Finch, Chan could not name a Minnesota college that they had visited. (*Id.*) Contrary to Cosgrove's testimony about Chan's demeanor, Finch testified that Chan was sweating and that Chan's answers to Finch's questions were short. (*Id.* at 55.)

Finch stepped away briefly to call his manager, Mike Kohanek, about the situation. (*Id.* at 20, 55-56.) Finch explained to Kohanek that he "had a passenger . . . with $90,000 . . . . [and] [j]ust through conversation [he] wasn't really getting answers on, on where [Chan] was going with it and whatnot." (*Id.* at 56.) Kohanek directed Finch to get Chan's information, finish the screening procedure, and let him go. (*Id.* at 57.) Finch testified that he did not contact the APD, but that Kohanek must have done so because before the screening process was over, Kohanek arrived at Checkpoint 5 with two APD officers – Officer Todd Husby and Sergeant Bill Stevens. (*Id.*)

While Finch was contacting Kohanek, Cosgrove searched another piece of Chan's luggage. (*Id.* at 20.) Cosgrove testified that while he was completing the search of the other bag, Kohanek and two plainclothes APD officers arrived. (*Id.* at 20, 60.) Cosgrove testified that he did not contact the APD, that he did not believe Finch had contacted APD, and that he didn't know why the APD officers had shown up. (*Id.* at 20-21.) Cosgrove testified that during that time, Chan "appeared to be fine; maybe getting a little impatient at this point." (*Id.* at 22.) Cosgrove further testified that by comparison to other selectees, Chan's demeanor was "rather mild." (*Id.* at 23.)

Cosgrove testified that Chan's screening took about seven to ten minutes. (*Id.* at 26-27.) Cosgrove testified that he did not have the opportunity to observe the two plainclothes APD officers' exchange with Chan because Finch had dismissed Cosgrove and instructed him to return to his other duties. (*Id.* at 28.)

## II.    APD OFFICERS' ARRIVAL AT THE SCREENING AREA

Finch also testified that when Kohanek and the APD officers walked up, Chan's boarding pass, identification, and luggage were on the screening table. (*Id.* at 60-61.) Husby and Stevens took Chan's boarding pass and identification. (*Id.* at 60.) Finch testified that a few minutes after the APD officers arrived, the two officers and Chan went to a TSA private screening room that was 15 to 20 feet away from the screening table. (*Id.* at 63-64.) According to Finch, one officer took Chan's luggage and followed behind Chan while the other officer walked in front of Chan. (*Id.* at 64.) Finch testified that he could not recall who was in possession of Chan's boarding pass and identification

when the officers escorted Chan to the private screening room.  (*Id.* at 65.) Finch later testified that he believed the boarding pass was placed next to Chan's luggage on the screening table, but Finch could not recall if he or Cosgrove placed the boarding pass and identification there.  (*Id.* at 86.)  Finch did not accompany the officers or Chan into the private screening room.  (*Id.* at 65.)

Husby testified that when he arrived at Checkpoint 5, he asked to see Chan's boarding pass and driver's license.  (*Id.* at 96-97.)  Husby learned that Chan was traveling to Chicago, which Husby knew to be a source city for narcotics.  (*Id.* 97.)  Husby testified: "After I looked at his boarding pass, I asked – or had TSA – either TSA themselves or I gave it back to Mr. Chan, his information and all his possessions back to him.  And then asked Mr. Chan if we could talk to him for a few minutes."  (*Id.* at 97-98.) Husby testified that he told Chan that he was not under arrest or "in any trouble," and that Husby just wanted to talk to him.  (*Id.* at 98.)  Husby did not tell Chan that he was free to go, nor did he tell Chan that he was not required to talk to Husby.  (*Id.* at 115.)

Husby suggested to Chan that they continue their conversation in the private screening room to get away from the noisy checkpoint area.  (*Id.* at 100.)  Husby testified that when they were inside the private screening room, the door was closed, but not locked.  (*Id.* at 114.)  Husby testified that when he questioned Chan about the purpose of his trip, Chan was not able to produce documentation to corroborate his story about buying copy machines.  (*Id.* at 102.)  Chan told Husby that he was in Minnesota to drop his daughter off at Concordia College's language camp.  (*Id.* at 102-03.)

While Chan was speaking with Husby, a K-9 officer and his dog arrived in the private screening room.  (*Id.* at 103, 124.)  Chan did not consent to a dog sniff of his luggage, but Husby testified that a dog sniff was a routine procedure whenever APD officers discovered a large amount of currency.  (*Id.* at 103.)  The dog alerted to the presence of narcotic odor on the money.  (*Id.* at 124.)  The APD officers then moved with Chan from the private screening room to the police operations center, where Chan stated that he wished to leave.  (*Id.*)  The officers permitted Chan to leave, but informed him that they were seizing the currency.  (*Id.*)

Husby testified that at some point **after** the dog sniff – when the officers arrived at the police operations center with Chan – he became aware that Chan had a criminal history and that there was an outstanding warrant out for his arrest.  (*Id.* at 126-27.)  Detective Mari Askerooth testified that a "wants and warrants" information request on Chan revealed that Chan had an outstanding felony arrest warrant for financial fraud that was issued on May 24, 2001.  (*Id.* at 132-33.)  Askerooth testified that she did not recall whether any officers near Checkpoint 5 knew about the warrant when they were questioning Chan.  (*Id.* at 133.)  Because the APD officers permitted Chan to leave the police operations center, the Court finds that the officers decided not to execute the arrest warrant.

## III.    CHAN'S BOARDING PASS, IDENTIFICATION, AND LUGGAGE

The Magistrate Judge emphasized the importance of the testimony about who had possession of Chan's boarding pass, identification, and luggage during the questioning by

APD officers. The Magistrate Judge noted: "Husby and Finch both gave contradictory and evasive testimony regarding what happened to Mr. Chan's boarding pass, identification and luggage between the time that Husby arrived at Checkpoint 5 and when Husby, Stevens and Chan went into the private screening room." (Report and Recommendation at 12, Docket No. 74.)

Husby initially testified: "I asked – or had TSA – either TSA themselves or I gave [the documentation] back to Mr. Chan, his information and all his possessions back to him." (Hr'g Tr. at 97-98, Docket No. 64.) The Magistrate Judge later questioned Husby about the issue:

> THE COURT: Okay. I believe you testified that when you arrived you requested that Mr. Chan's boarding pass and driver's license be returned to him. Do you know to whom you directed that request?
>
> THE WITNESS: By name? No, no, I don't, just the TSA personnel.
>
> THE COURT: Do you know if it was actually accomplished?
>
> THE WITNESS: He had his stuff at some point and was given his stuff. As a normal procedure, yes he would have been returned it.
>
> THE COURT: I understand at some point the normal procedure, et cetera, et cetera. What I'm trying to find out, in this case, did Mr. Chan have in hand his boarding pass and driver's license before he went into the screening room with you to answer questions about the money?
>
> THE WITNESS: I can't tell you with 100-degree – 100 percent certainty whether he had them or whether he didn't at this time.

(*Id.* at 121-22.)

Finch testified that TSA officers would have returned Chan's boarding pass and identification, but, when pressed, Finch equivocated:

THE COURT:          . . . . To whom was his boarding pass and identification given?  Were they given back to Mr. Chan?

THE WITNESS:        Yes.  What – the, the – the way it works is our –

THE COURT:          No, not how it works.  At the point the police arrived, I believe your testimony earlier was that it's the policy of the TSA to maintain and keep custody of the boarding pass and ID until the screening process is completed.  Is that a correct statement?

THE WITNESS:        Yes, it is.

THE COURT:          Okay.  So who had it during the time before the police arrived, you or Mr. Cosgrove?

THE WITNESS:        It was sitting next to – see we have to log down, when somebody's a selectee, we have to  – we have a log sitting on the table right next to the screening table.  His boarding pass and his ID were sitting right up by that log so we can log that information down.

THE COURT:          Okay.

THE WITNESS:        And after the screening's completed, we set the IDs and the boarding pass down by the luggage so the person doesn't forget them when they walk out of the checkpoint.

THE COURT:          Did you do that?

THE WITNESS:        I don't recall which one of us did that, but it was placed back down with Mr. Chan's items on the table.

THE COURT:          And was Mr. Chan told, here is your boarding pass, here is your ID, you are now free to go?

THE WITNESS:        That's our procedure.

THE COURT:         No, was Mr. Chan told that?

THE WITNESS:       I don't – I don't recall.

THE COURT:         Did you tell him that?

THE WITNESS:       I don't recall if I told him that or if [Cosgrove] told
                   him that.

THE COURT:         Do you know if anyone told him that?

THE WITNESS:       I'm not sure, no.

(*Id.* at 61-62.)

The Magistrate Judge found:

> While both [Finch and Husby] had difficulty recalling what they did with
> Chan's boarding pass and identification, the testimony regarding Chan's
> luggage was more clear. Finch unequivocally testified that the APD
> officers, "took his, his luggage and he followed them into our private
> screening room, TSA's private screening room . . . . one officer took his
> luggage and followed behind Mr. Chan while the other one was in front of
> him." (Tr. 63-64). Although Husby initially testified that he had returned
> all of Chan's possessions to him (Tr. 97), he later testified that he could not
> recall whether he or Sergeant Stevens took possession of Chan's luggage,
> which would appear to corroborate TSA Supervisor Finch's testimony that
> the luggage was not returned, but was taken by one of the two police
> officers into the TSA's private screening room. (Tr. 98-99.)

Given those findings, the Magistrate Judge concluded:

> Sorting through the inconsistent, contradictory, and evasive
> testimony of both Finch and Husby, the Court finds that the government
> has failed to establish that Chan's boarding pass and identification were
> returned to him before the police carried his luggage into the TSA's private
> screening room into which they also escorted Mr. Chan. The Court finds
> there is no credible evidence that anyone returned Mr. Chan's documents
> and told him he was free to go at what the government now claims is the
> conclusion of the TSA screening process. To the extent either witness
> attempted to testify that the boarding pass and identification w[ere]
> returned, this Court expressly disbelieves such testimony.

- 11 -

At best, the record establishes that neither witness has an independent recollection of whether the boarding pass and identification were returned. (TR. 65; 121-122) The testimony is clear that Chan's luggage was not returned, but was carried by one of the two APD officers who escorted Chan into the TSA's private screening room. This Court finds that neither the luggage nor Chan's documents were returned to him before he was escorted into the TSA's private screening room.

(Report and Recommendation at 12-14, Docket No. 74.)

## IV. THE REPORT AND RECOMMENDATION

Chan filed a motion to suppress, arguing that the APD officers' seizure of Chan and search of his luggage violated the Fourth Amendment protection against unreasonable searches and seizures. The United States responded that Chan's encounter with APD officers was consensual and, in the alternative, that the APD officers had reasonable suspicion to detain Chan.

The Magistrate Judge recommends that the Court grant Chan's motion. In particular, the Magistrate Judge finds that at the time APD officers arrived at the screening area, "a reasonable traveler in Chan's situation would have reasonably thought he was still not free to go, as he was now being escorted by two police officers into a TSA private screening room." (*Id.* at 8; *see also id.* at 9 ("The Court finds as a fact that Chan, as would any reasonable traveler under these circumstances, felt compelled to accompany the narcotics officers into the TSA's private screening room.").) The Magistrate Judge stated that he "expressly disbelieves Husby's testimony that he gave 'all [of Chan's] possessions' back to Mr. Chan." (*Id.* at 10.) The Magistrate Judge also concluded that Chan did not consent to the detention and search, that APD officers did

not have reasonable suspicion to detain Chan and search his belongings, and, therefore, that "[t]he $90,000 seized from Mr. Chan was the fruit of an unlawful seizure of his luggage as well as the unlawful detention of Mr. Chan. The money must be suppressed." (*Id.* at 15.)

The United States objects to the Report and Recommendation. (Docket Nos. 78, 79.) The United States argues that the Magistrate Judge erred in concluding that the officers did not have reasonable, articulable suspicion to justify the search and seizure and that the Magistrate Judge made unwarranted credibility determinations in the Report and Recommendation. (Objections at 1, Docket No. 79.) The focus of the United States' objections is whether APD officers had reasonable suspicion sufficient to justify a *Terry* stop. The United States also asks, in the event that the Court is inclined to accept the Report and Recommendation, that the Court conduct a new hearing to make its own *de novo* determinations concerning witness credibility.

## DISCUSSION

The Court reviews *de novo* those portions of the Magistrate Judge's Report and Recommendation to which the United States objects. *See* 28 U.S.C. § 636(b)(1)(C); D. Minn. LR 72.2(b); *see also United States v. Raddatz*, 447 U.S. 667, 693 (1980) (Stewart, J., dissenting) ("Congress expressly limited the clearly erroneous standard of review to pretrial motions that are termed non-dispositive in the [Federal Magistrates] Act's legislative history and excluded habeas corpus petitions, motions to suppress, and

other important motions from that category." (citations and internal quotation marks omitted)).

## I. STANDING

In its objections, the United States argues that Chan does not have standing to bring the instant motion to suppress because Chan has claimed that "a substantial portion of the $90,000 did not and does not belong to him." (Objections at 4-6, Docket No. 79.) The record demonstrates that the United States did not raise this standing issue before the Magistrate Judge.[2] (*See* Mem. in Opp'n to Corrected Mot. to Exclude Physical Evidence, Docket No. 69.) "[A] claimant must present all his claims squarely to the magistrate judge, that is, the first adversarial forum, to preserve them for review." *Roberts v. Apfel*, 222 F.3d 466, 470 (8th Cir. 2000). The Court therefore declines to consider that argument here. *See id.* ("[T]he purpose of referring cases to a magistrate for recommended disposition would be contravened if parties were allowed to present only selected issues to the magistrate, reserving their full panoply of contentions for the trial court." (internal quotation marks omitted)). Accordingly, the Court overrules the United States' objections to the extent the United States challenges Chan's standing to bring the motion to suppress.

---

[2] In a motion to strike Chan's answer to the complaint, the United States challenged Chan's standing on the basis that Chan did not comply with filing requirements to establish an interest in the property, as required by 18 U.S.C. § 983(a)(4) and Rule G(5) of the Supplemental Rules For Certain Admiralty and Maritime Claims. (Mem. in Supp. of Mot. to Strike Answer to Compl. at 1-2, Docket No. 12.) On June 3, 2008, the Magistrate Judge issued an order denying the motion to strike. (Docket No. 30.) The United States did not appeal that order.

## II.    VIOLATION OF FOURTH AMENDMENT RIGHTS

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "[T]he Search Clause is wholly distinct from the Seizure Clause[.]"  *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005).  "[A] Fourth Amendment search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  *Id.*  (internal quotation marks and emphasis omitted).  A Fourth Amendment seizure occurs when there is "meaningful interference, however brief, with an individual's freedom of movement."  *Id.*  (internal quotation marks omitted).  Generally, items seized in violation of the Fourth Amendment may not be used as evidence at trial.  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  This exclusionary rule applies to forfeiture proceedings.  *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965); *see also United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999) ("The Fourth Amendment's exclusionary rule applies to quasi-criminal forfeiture proceedings.").

"An encounter between citizens and police does not trigger Fourth Amendment scrutiny unless it loses its consensual nature."  *United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006) (internal quotation marks omitted).  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (some internal quotation marks omitted).  "A seizure does not occur simply

because a police officer approaches an individual and asks a few questions, so long as a reasonable person would feel free to disregard the police and go about his business." *Carpenter*, 462 F.3d at 985 (internal quotation marks omitted).

### A. APD Officers Did Not Have Reasonable Suspicion to Believe That Chan Was Involved in Criminal Activity.

"[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). To establish justification for a *Terry* stop, the officer must "articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (internal quotation marks omitted). "Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing." *United States v. Hamilton*, 591 F.3d 1017, 1022 (8th Cir. 2010); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) (stating that in evaluating the validity of a stop under the reasonable suspicion standard, the Court considers "the totality of the circumstances – the whole picture"). The consideration of the totality of the circumstances accounts for the expertise and common sense judgments of law enforcement officers. *See Cortez*, 449 U.S. at 418; *Brown v. Texas*, 443 U.S. 47, 52 & n.2 (1979).

In determining the constitutionality of a search or seizure, the relevant inquiry is whether "the facts available to the officer **at the moment of the seizure or the search**

warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 21-22 (emphasis added); *see also Hamilton*, 591 F.3d at 1022 ("But the Fourth Amendment applies to the act of searching, not the initial decision to search, and it applies an objective standard based on the information known by the searching officers **at the time of the search**." (emphasis added)).

The Magistrate Judge concluded:

> Airport Police had no more than a hunch that the $90,000 was drug related, and as Mr. Chan never consented to the seizure of his luggage, the APD's seizure of Mr. Chan's luggage, to subject it to a dog sniff, when they arrived just prior to the conclusion of the TSA screening was unlawful and the money must be suppressed.

(Report and Recommendation at 19, Docket No. 74.) The United States argues that before the dog sniff was performed, the APD officers possessed reasonable, articulable suspicion that Chan may have been involved in criminal activity.[3] (Objections at 6, Docket No. 79.)

The United States cites several facts of which the APD officers were aware that provided, according to the United States, a reasonable, articulable suspicion to stop Chan

---

[3] The United States does not appear to pursue the argument that the search and seizure was consensual, but instead focuses on the argument that Airport Police possessed "reasonable, articulable suspicion" that Chan may have been involved in criminal activity. (Objections at 6-13, Docket No. 79.) To the extent that the United States purports to challenge the consensual nature of Chan's interactions with the Airport Police by objecting "to the legal conclusions set forth in . . . pages 15-29 of the Report and Recommendation," those objections are only general objections and are therefore inadequate. *See* Fed. R. Civ. P. 72(b)(2) (requiring that a party to "serve and file specific written objections to the proposed findings and recommendations"); *see also Mayer v. Walvatne*, No. 07-1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008). To the extent that the United States pursues its "consent" argument by challenging the credibility determinations of the Magistrate Judge, the Court addresses those arguments further below.

and investigate: Chan was carrying a large amount of cash, stacked in bundles; the airport police testified that they found Chan's description of his business implausible, in part because Chan was not able to produce supporting documentation; Chan was traveling on a one-way ticket from Minneapolis to Chicago, and Chicago was a known source city for narcotics in Minnesota; and Chan made various inconsistent statements about the use of the cash and its source. The United States argues that the Report and Recommendation neglects to consider those factors and contends that even apparently innocent conduct could form the basis for the officers' reasonable suspicion of criminal activity. *See Sokolow*, 490 U.S. at 9 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion.").

The facts of which the APD officers were aware at the time they detained Chan did not give rise to a reasonable suspicion that Chan was involved in criminal activity. The Court finds that at the time the APD officers began interacting with Chan, they were at least aware that Chan had $90,000 in his possession. Finch testified that when he contacted Kohanek by phone, he reported: "I had a passenger here with $90,000. Just through conversation I wasn't really getting answers on, on where he was going with it and whatnot." (Hr'g Tr. at 56.) According to Finch's testimony, however, at the time of the call, Finch already knew that Chan was going to Chicago with the money. (*See id.* at 53.) The Court agrees with the Magistrate Judge that the "whatnot" can be construed, at best, as a mere "hunch." Further, there is nothing inherently unlawful about Chan's possession of $90,000 or Chan's traveling with large amounts of currency within the

United States. Moreover, Finch's testimony that Chan could not identify certain colleges in Minnesota is not particularly probative where Husby testified that Chan informed Husby that he was taking his daughter to the Concordia Language Village. (*See id.* at 102-03.) Further, although Finch and Husby testified that Chan's story about his business seemed suspicious, neither identifies specific inconsistencies or implausibilities in Chan's explanation. Askerooth generally noted that there were inconsistencies in Chan's description of his job, but Askerooth also could not identify or explain any specific inconsistencies. Indeed, Husby testified that other than the dog's alert to the currency, there was no drug-related evidence found in Chan's luggage or on his person. (Tr. 126-27.)

The United States also cites several cases in support of its argument that courts have found reasonable suspicion in similar circumstances, but the Court finds those cases unpersuasive in light of their unique facts and the totality-of-the-circumstances standard. Although the Court does not endeavor to address every one of those cases, the Court notes that the United States cites them in support of its contention that certain facts – e.g., large amounts of cash or a police officer's awareness of narcotics source cities – may support a finding of reasonable suspicion of drug activity. Those cases are not particularly helpful, however, as their finding of reasonable suspicion was also premised on other important facts—such as a suspect's admissions to the possession of drugs – which comprise the totality of the circumstances. *See, e.g.*, *United States v. Stephenson*, 924 F.2d 753, 759 (8th Cir. 1991). The United States does not argue that APD officers were aware of similar facts here. *Cf. Florida v. Royer*, 460 U.S 491, 506-07 (1983)

("Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment.").

Moreover, the Court finds that at the time the APD officers arrived and detained Chan they knew only that Chan was carrying $90,000, that Chan was traveling to Chicago from Minnesota on a one-way ticket, and that there were apparent, albeit unspecific, "inconsistencies" in Chan's story about his business and about the source of the currency. Even crediting the APD officers' expertise and common sense judgments, the totality of the circumstances does not support a reasonable suspicion on the part of APD officers that Chan was engaged in criminal activity. *See Terry*, 392 U.S. at 21-22.

The Court excludes two facts from its assessment of reasonable suspicion because those facts were not known to police officers **at the time they detained** Chan and escorted him to the private TSA screening room. First, the Court does not consider the dog's alert to narcotics odor on the currency. The dog sniff occurred inside the private screening room **after** Chan had been detained. Second, the Court concludes that the presence of an outstanding felony warrant for Chan's arrest should not be considered in evaluating whether the APD officers had reasonable suspicion. Husby testified that he was not aware of the outstanding arrest warrant or Chan's criminal history until he arrived at the police operations center, **after** the dog sniff had occurred. (Hr'g Tr. at 126-27.) Accordingly, those facts are not relevant to the question of whether APD officers, at

the time of the *Terry* stop, had reasonable suspicion to believe that Chan was involved in criminal activity. *See Terry*, 392 U.S. at 21-22

Because the Court concludes that the APD officers did not have reasonable suspicion to detain Chan, the detention and subsequent search of his luggage violated the Fourth Amendment, and the exclusionary rule applies to exclude from evidence the fruits of those unconstitutional actions. As a consequence, the Court need not reach the question of whether the detention exceeded the limits of a *Terry* stop. However, given the United States' objections to the Magistrate Judge's conclusions on that issue, the Court addresses the scope of the detention in the following section.

### B.      The Detention Exceeded the Permissible Limits of a *Terry* Stop.

Even assuming that APD officers possessed a reasonable suspicion that Chan may have been engaged in criminal activity, Chan's detention exceeded the permissible limits of a *Terry* stop. "An investigative stop must be temporary and must last no longer than is necessary to effectuate the purpose of the stop. . . . [and] the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Dixon*, 51 F.3d 1376, 1380 (8th Cir. 1995) (citation and internal quotation marks omitted); *see also Royer*, 460 U.S. at 500. The United States has the "burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500. The United States argues that "the initial screening room interview amounted to a

reasonable, temporary investigative stop that was no more intrusive than necessary to verify or dispel the APD's suspicions that Chan was involved in narcotics trafficking." (Objections at 10, Docket No. 79.)

The Court expressly adopts the Magistrate Judge's cogent and well-reasoned analysis, in which the Magistrate Judge concludes that the removal of Chan and his luggage to the private screening room exceeded the permissible bounds of a *Terry* stop. (Report and Recommendation at 24-28, Docket No. 74.) The Magistrate Judge carefully compared the facts of this case to similar facts in the Supreme Court's opinion in *Florida v. Royer*. *See generally* 460 U.S. at 493-97, 501-06. In *Royer*, the Supreme Court concluded that police officers' detention of the defendant at an airport exceeded the bounds of a *Terry* stop. The Supreme Court described its reasoning in part by comparing the facts in *Royer* to another Supreme Court case, *United States v. Mendenhall*, 446 U.S. 544 (1980), stating:

> The case before us differs in important respects. Here, Royer's ticket and identification remained in the possession of the officers throughout the encounter; the officers also seized and had possession of his luggage. As a practical matter, Royer could not leave the airport without them. In *Mendenhall,* no luggage was involved, the ticket and identification were immediately returned, and the officers were careful to advise that the suspect could decline to be searched. Here, the officers had seized Royer's luggage and made no effort to advise him that he need not consent to the search.

*Royer*, 460 U.S. at 503 n.9.

The Magistrate Judge conducted a similar analysis with respect to Chan's detention:

The facts here are much closer to the facts in *Royer* than they are to the facts in *Mendenhall*.

Here, as in *Royer*, the APD took Claimant and his luggage to the TSA private screening room, which was adjacent to the screening check point, but several feet away. Here, as in *Royer*, and unlike in *Mendenhall*, Chan's identification and boarding pass were not immediately returned. While the testimony on this point was far from clear, for the reasons set forth above . . . , the Court concludes that the government has failed to establish that those documents were returned before the removal to the TSA's private screening room.

Here also, as in *Royer*, and unlike in *Mendenhall*, Chan was not notified that he was free to leave if he so chose. The government correctly observes that the Supreme Court has never held that police are required to tell a suspect he is free to go, or that he has the right to refuse consent to search. *Royer* and *Mendenhall*, however, make clear that whether such advice was given is clearly a factor the Court should consider in making a decision about whether a reasonable person would believe they were free to leave, and whether a given stop exceeded the bounds of a reasonable *Terry* stop. The failure to communicate that Chan was free to leave is even more significant in this case than in *Royer*. Unlike Royer, who before his police encounter had been freely going about his business, when Chan encountered the APD he was being detained during the TSA screening where the government concedes he was *not* free to leave.

(Report and Recommendation at 27-28, Docket No. 74 (footnote omitted).)

The United States does not challenge the Magistrate Judge's analysis, but instead argues that other facts establish that Chan's detention was appropriate. The United States contends that no APD officer ever touched or otherwise attempted to intimidate Chan; the "APD witnesses stated that Chan would have been allowed to leave had he requested to do so; the officers only showed Chan to the private screening room "to get away from the noisy, chaotic environment of an airport security checkpoint"; and the investigation in the private screening room "was a mere five to ten minutes." (Objections at 9, Docket No. 79.)

In light of the Magistrate Judge's analysis, these additional facts are unpersuasive. The fact that the APD officers did not touch or attempt to intimidate Chan does not change the Court's analysis; there are adequate additional facts demonstrating that the investigative stop exceeded the allowable limits of a *Terry* stop. The testimony suggesting that Chan would have been allowed to leave if he had requested to do so is irrelevant because there is no testimony that Chan was informed of that right and because Chan – like any other reasonable traveler – was likely still proceeding under the directive from the TSA that he could not leave the screening area until he was cleared. That is, there is no meaningful event in the record demonstrating that a person in Chan's position would have viewed the TSA screening and the encounter with APD officers as two separate events. Moreover, although the APD officers stated that they went to the private screening room to get away from the noisy environment of the checkpoint, that fact is less probative where the officers eventually closed the door to the screening room. Notably, there is no evidence in the record that officers wanted to move Chan to the private screening room for "reasons of safety and security." *See Royer*, 460 U.S. at 504. Finally, as the United States concedes, the timing of the detention is only one fact of many to consider. *See United States v. Donnelly*, 475 F.3d 946, 953-54 (8th Cir. 2007).

Even assuming that the APD officers possessed reasonable suspicion at the time of the detention and dog sniff that Chan was involved in criminal activity, the APD officers' detention of Chan exceeded the permissible bounds of a *Terry* stop. For that additional reason, the evidence must be suppressed.

## III.    THE MAGISTRATE JUDGE'S ADVERSE CREDIBILITY FINDINGS

Testimony regarding the possession of Chan's boarding pass, identification, and luggage is relevant to the question of whether Chan voluntarily consented to the APD officers' questioning and the reasonableness of his detention.  *See United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988) ("An officers' [sic] retention of an airline ticket or a driver's license has been treated as a significant factor in determining that a seizure has occurred.").  The Magistrate Judge determined that Finch and Husby "gave contradictory and evasive testimony" concerning whether Chan's luggage and travel documents were returned to him prior his APD interview, and concluded that there was no credible evidence that anyone had returned Chan's documents to him.  (Report and Recommendation at 12, 14, Docket No. 74.)  The United States argues that such a "harsh characterization" of their testimony was unwarranted because Finch and Husby's testimony demonstrates that they were merely trying to recollect an event that had taken place two years prior to their testimony.

The Court concludes that the Magistrate Judge did not err in finding that Finch and Husby offered contradictory or evasive testimony.  Finch and Husby initially testified with a notable degree of certainty that Chan's documents were returned to him.  When pressed, however, each qualified their responses or changed them.  Further, in response to clear "yes or no" questions, Finch and Husby made evasive references to TSA "procedures," an apparent attempt to avoid answering, before the Magistrate Judge pressed them to provide a direct answer.  Then, they conceded that they were not, in fact, sure about whether Chan's documents had been returned to him.

The United States asks the Court to "vacate" the Report and Recommendation and conduct a "new hearing . . . in order for this Court to make its own determinations concerning the credibility of the witnesses." (Objections at 15, Docket No. 79.) The Court declines to do so. Under 28 U.S.C. § 636(b)(1)(B), a magistrate judge may conduct evidentiary hearings on motions to suppress evidence and may submit proposed findings of fact and recommend a disposition of the motion. The district court "shall make a de novo **determination** of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* § 636(b)(1) (emphasis added). "[O]n these dispositive motions, the statute calls for a *de novo* determination, not a *de novo* hearing." *Raddatz*, 447 U.S. at 674; *see also id.* at 676 n.3 ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."). Here, the Magistrate Judge properly found the facts of the case and made appropriate determinations about the credibility of the witnesses. *Cf. United States v. Risken*, 869 F.2d 1098, 1100 (8th Cir. 1989) (per curiam) ("The district court is in the best position to observe the demeanor of the witnesses and to assess credibility, and such factual findings shall not be set aside unless clearly erroneous."). Accordingly, the Court denies the United States' request for a new hearing.

In sum, the Court overrules the United States' objections and adopts the Report and Recommendation of the Magistrate Judge. The Magistrate Judge properly concluded that Chan's detention and the subsequent dog-sniff violated Chan's Fourth Amendment

rights, that the currency at issue was seized in violation of the Fourth Amendment, and that the Court must therefore suppress that evidence. The Court also declines to hold a new hearing on the motion to suppress.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, the Court **OVERRULES** the United States' Objections [Docket No. 78] and **ADOPTS** the Report and Recommendation of the Magistrate Judge dated September 22, 2009, [Docket No. 74]. Therefore, **IT IS HEREBY ORDERED** that Claimant Johnny Chan's Corrected Motion to Exclude Physical Evidence [Docket No. 53] is **GRANTED**.

**IT IS FURTHER HEREBY ORDERED** that The United States' Request for a New Hearing [*See* Docket No. 78] is **DENIED.**


DATED: March 31, 2010
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge